**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Charles Medina,

Plaintiff,

v.

EMSA Correctional Care, Inc.,
A. Platz, M.D., White Cell Medical,
Kathy DeBuhr, and Mr. Nelson,

Defendants.

Civil No. 01-838 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

---

Paul A. Sortland, Sortland Law Office, Minneapolis, Minnesota, for Plaintiff.

Bruce P. Candlin and Martha K. Sieber, Candlin & Heck, Bloomington, Minnesota, for Defendants EMSA Correctional Care, Inc. and Kathy DeBuhr.

---

## Introduction

Plaintiff Charles Medina injured his Achilles tendon while he was an inmate at the Prairie Correctional Facility (the "PCF"). Kathy DeBuhr, the nurse on duty, first saw him after his injury and referred him to Dr. Platz, who initially diagnosed the injury as a sprain. Medina continued to experience pain. After seeing several doctors and having an MRI, an orthopedist determined that he had ruptured his Achilles tendon. Medina underwent surgery four months after the injury occurred. Approximately two years later, Medina commenced this action alleging claims of negligence, emotional distress, and a violation of 42 U.S.C. § 1983. Before the Court is EMSA Correctional Care, Inc.



JUL 10 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

("EMSA") and Kathy DeBuhr's Motion for Partial Summary Judgment. They assert that the affidavits Medina submitted in support of his medical malpractice claims do not comply with Minnesota Statute § 145.67 and therefore, those claims should be dismissed. For the reasons set forth below, the motion will be granted.

**Background**

On April 30, 1999, Medina, an inmate at the PCF in Appleton, Minnesota, injured his left ankle/Achilles tendon while playing handball.[1] (Sieber Aff. Ex. A (Affidavit of Pamela Velner) ¶ 4; Ex. B (Affidavit of Dr. Larry McClain) ¶ 4.) At the time, EMSA had a contract with the PCF to provide nursing staffing for the inmates, and DeBuhr, the nurse on duty, was employed by EMSA. (Am. Compl. ¶¶ 5, 7.) Medina, who had previously ruptured his right Achilles tendon, complained to DeBuhr that he had ruptured his left Achilles tendon.[2] (Sieber Aff. Ex. A ¶ 4, Ex. B ¶ 4.) In a progress note, DeBuhr wrote that she was "suspicious of a ruptured Achilles tendon" and referred him to Dr. Platz, a doctor at the PCF. (Id. Ex. A ¶ 4, Ex. B ¶¶ 4-5.) Dr. Platz initially diagnosed the injury as a possible left Achilles tendon sprain and ordered Medina to stay off his foot for two days. (Id.) Dr. Platz also ordered ibuprofen for the pain and swelling. (Id.)

---

[1]For the purposes of this motion, EMSA and DeBuhr accept as true the allegations contained in the experts' affidavits. (Defs' Mem. in Supp. of Summ. J. at 3.)

[2]The affidavits do not state which nurses treated Medina. From the memoranda submitted to the Court, it appears that DeBuhr was the nurse on duty when Medina first complained of his injury. (See Defs' Reply Mem. at 6.) It also appears that Medina was seen by other nurses employed by EMSA while he was an inmate at the PCF.

Between April 30, 1999 and June 9, 1999, Medina complained about his injury often, and he had at least four doctor's appointments before an orthopedic consult and MRI were ordered. (Id. Ex. A ¶ 6; Ex. B ¶¶ 5-9.) The MRI was performed on July 2, 1999, which showed that Medina had ruptured his left Achilles tendon. (Id. Ex. A ¶ 7; Ex. B ¶ 9.) On August 3, 1999, an orthopedic surgeon saw Medina and wanted to do surgery as soon as possible. (Id. Ex. A ¶ 7; Ex. B ¶ 9.)

Medina had surgery on September 1, 1999. (Id. Ex. A ¶ 8; Ex. B ¶ 9.) After surgery, Medina had numerous problems relating to the injury, including pain, immobility, and infections, and at least three follow-up surgeries. (Id. Ex. A ¶¶ 8-9; Ex. B ¶¶ 11-14.) In addition, from the time of his injury through his various surgeries, Medina alleges that he did not receive proper ambulatory aids such as crutches or a brace, that pain medicine was dispensed in an arbitrary manner, that his wound was not regularly checked, and that no nutritional assessment was made for optimal wound healing. (Id. Ex. A ¶¶ 12-16.) Sometime in the summer of 2000, Medina was transferred from the PCF to a prison facility in Hawaii, where he underwent a fifth surgery to repair his Achilles tendon. (Id. Ex. A ¶ 9; Ex. B ¶¶ 15-16.) He continues to suffer from loss of mobility, and further tests have suggested that he has a chronic debilitating condition that will continue to affect him in the future. (Id. Ex. B ¶ 21.)

Medina commenced this action in Hennepin County District Court, with a three-count Complaint dated April 25, 2001. On May 15, 2001, the defendants jointly removed

the action to this Court because the Court has federal subject matter jurisdiction over the federal claim arising under 42 U.S.C. § 1983 and supplemental jurisdiction over the remaining claims. See 28 U.S.C. §§ 1331, 1367. On June 26, 2001, Medina amended his complaint to add additional claims and defendants; in the Amended Complaint, he alleges claims of (1) negligence, (2) medical negligence, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, and (5) a violation of 42 U.S.C. § 1983 against six defendants.[3] (See Am. Compl.)

Pursuant to Minn. Stat. § 145.682, which requires expert affidavits to be served in medical malpractice actions requiring expert testimony, Medina served two affidavits of expert identification on defendants on October 22, 2001. Pamela Velner, a registered nurse, submitted one expert affidavit, and Dr. Larry McClain, a board certified doctor of sports medicine and pediatrics, submitted a second affidavit. On May 28, 2002, two of the defendants, EMSA and Debuhr, moved for summary judgment on the medical malpractice claims on the ground that the experts' affidavits fail to meet the requirements

[3]Pursuant to a settlement agreement, the claims against one of the defendants, Corrections Corporation of America, have been dismissed. (See Stipulation for Dismissal with Prejudice and Order dated April 30, 2002.) In addition to EMSA and DeBuhr, the other remaining defendants include: (1) Dr. Platz, the doctor who initially diagnosed Medina, (2) White Cell Medical, a corporation that provides doctors to prison institutions, although it is not known whether Dr. Platz was an employee of White Cell Medical; and (3) Mr. Nelson, a former medical administrator employed by Correction Corporations of America. (Am. Compl. ¶¶ 3, 4, 8.) It does not appear that these defendants have been served, and they have not answered or otherwise appeared in this matter. Accordingly, the Court, pursuant to Fed. R. Civ. P. 4(m), will direct Plaintiff to show cause why his claims against these three defendants should not be dismissed.

of Minn. Stat. § 145.682.

## Analysis

### I. Medical Negligence

Minnesota law requires a plaintiff to file two separate affidavits in medical malpractice cases when expert testimony is needed to establish a prima facie case. Minn. Stat. § 145.682, subds. 2-4. In Count II, Medina alleges that the defendants were medically negligent in their failure to diagnose his ruptured Achilles tendon. (See Am. Compl. Count II.) In failure-to-diagnose cases, expert testimony is needed for the plaintiff's prima facie case to show the applicable standard of care for diagnosing a medical condition and to determine whether a doctor's actions failed to meet that standard. See Bellecourt v. United States, 784 F. Supp. 623, 638-39 (D. Minn. 1992) (Doty, J.) (reviewing Minnesota medical malpractice case law concerning when expert testimony is needed). Therefore, Medina must comply with the requirements of § 145.682 for his claim in Count II.

Pursuant to § 145.682, when a plaintiff serves a defendant with the summons and complaint, the complaint must be accompanied by an affidavit of the plaintiff's attorney stating that the facts of the case have been reviewed by the attorney with an expert who is of the opinion that the defendant "deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682., subd. 3. Then within 180 days after commencement of the suit, the plaintiff must serve upon the defendant a

second affidavit which:

> must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Id., subd. 4. The second affidavit is sometimes called the affidavit of expert identification and is the focus in this case. Failure to comply with either affidavit requirement results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is required to establish a prima facie case. Id., subd. 6[4]; see also Lindberg v. Health Partners, Inc., 599 N.W.2d 572, 578 (Minn. 1999).

Since 1990, the Minnesota Supreme Court has discussed the requirements of § 145.682 in five cases. See Sorenson v. St. Paul Ramsey Med. Ctr., 457 N.W.2d 188 (Minn. 1990); Stroud v. Hennepin County Med. Ctr., 556 N.W.2d 552 (Minn. 1996); Lindberg, 599 N.W.2d at 578; Anderson v. Rangachary, 608 N.W.2d 843 (Minn. 2000); Teffeteller v. University of Minnesota, __ N.W.2d __, 2002 WL 1291833 (Minn. June 13, 2002). In each case, the court has explained that in order to comply with the requirements of subdivision 4, the affidavit of expert identification must (1) disclose specific details

[4]Subdivision 6 was amended on May 22, 2002. See Act of May 22, 2002, ch. 403, § 1, 2002 Minn. Laws (amending Minn. Stat. § 145.682, subd. 6). Subdivision 6 now allows a plaintiff time to correct deficiencies in an affidavit of expert identification before mandatory dismissal. This amended section applies to causes of action commenced on or after May 22, 2002 and therefore, is not applicable in this case.

concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages. Sorenson, 457 N.W.2d at 190.

When describing the applicable standard of care, the affidavit must not simply state that the standard of care requires avoiding injury; rather, the affidavit must specifically describe the affirmative actions a healthcare provider should take. See Anderson, 608 N.W.2d at 848. In addition, an expert affidavit stating that the defendants "failed to properly evaluate" or "failed to properly diagnose" the patient does not satisfy § 145.682 because it does not set out how the expert will use the facts in the hospital record to arrive at opinions of malpractice and causation. Sorenson, 457 N.W.2d at 192-93. For example, in Stroud, a case alleging malpractice based on the defendants' failure to timely diagnose and treat an injury, the court concluded that the expert affidavit provided only broad and conclusory statements as to causation because it failed to connect the decedent's cause of death to the defendant's alleged delay in properly diagnosing and treating the decedent. Stroud, 556 N.W.2d at 556. The court noted that the expert affidavit "should set out how the expert will use those facts to arrive at opinions of malpractice and causation." Id., 556 N.W.2d at 555 (internal citations omitted). The expert affidavit in Stroud failed to comply with § 145.682 because it contained only conclusory statements based on facts found in the hospital or clinic record.

Id. at 555-56.

EMSA and Debuhr contend that Medina's affidavits of expert identification do not meet the statutory requirements of §145.682 because they fail to (1) provide the standard of care which governs nurses in a correctional facility; (2) properly delineate how the EMSA nurses allegedly failed to adhere to the standards; and (3) provide an outline of the chain of causation between any deviation from the standard of care and Medina's injuries. In response, Medina asserts that the affidavits are sufficient, and he argues that Minn. Stat. § 145.682 is unconstitutional.

### A. Affidavit of Pamela Velner

In her affidavit, Ms. Velner outlines the relevant factual background and states that "it is my opinion that the employees at the Prairie Correctional Facility failed to timely diagnose and institute proper interventions required to stabilize and correct the inmate's injury." (Sieber Aff. Ex. A ¶ 10.) She states that Dr. Platz failed to perform a routine exam, called the Thompson Test, to assess the nature of Medina's ankle injury. (Id. Ex. A ¶ 11.) Based on this failure, she opines that "[t]he standard of care pertaining to appropriate clinical and diagnostic maneuvers would have required Dr. Platz, or someone else at the facility, to perform this routine exam at that time." (Id. (emphasis added).) She also states that the standard of care required that proper ambulatory aids be ordered but that Medina was not provided with any crutches or braces. (Id. Ex. A ¶¶ 12-13.) She does not describe, however, the proper standard of care.

In addition, Ms. Velner states that pain medication was withheld or distributed in an arbitrary manner, that daily wound checks were not done, and that no nutritional assessment was documented for Medina. (Id. Ex. A ¶¶ 14-16.) From this, she concludes that "[t]he facility failed to provide quality care to Mr. Medina," and that "[t]he facility neglected to provide services that were necessary to avoid physical harm and mental anguish." (Id. ¶¶ 18-19 (emphasis added).)

A supplemental affidavit of Pamela Velner dated May 23, 2002 was filed with Medina's Memorandum in Opposition to Summary Judgment.[5] In her supplemental affidavit, she attaches a report dated May 22, 2002, which is based on her review of the facts and records in the case as well as EMSA and Debuhr's Memorandum in Support of Summary Judgment. (Velner Supp. Aff. ¶ 2.) In her supplemental affidavit, Ms. Velner relies on the Code of Ethics for Nurses and the Scope and Standards of Nursing Practice in Correctional Facilities, both published by the American Nurses Association, to outline the standard of care EMSA and DeBuhr should have followed. She states that "[h]ealthcare is a team effort . . . The healthcare team at PCF had a shared responsibility to ensure that Mr. Medina received appropriate quality care" and that although it is a doctor's responsibility to order medication, aids or equipment, it is also "the nurses

---

[5]EMSA and DeBuhr do not address whether this supplemental affidavit should be considered given that it was served more than 180 days after the commencement of the suit and responds directly to the summary judgment motion. See Minn. Stat. § 145.682, subd. 2. This issue, however, is moot, given that the Court has determined that the supplemental affidavit does not meet the requirements of § 145.682.

responsibility . . . to ensure that if not ordered, to question and/or ask the physician for the order." (Velner Supp. Aff. Ex. A p. 2.) In addition, she states that the nurses at EMSA should have developed and documented a nursing care plan for Medina. (Id. Ex. A pp. 3-4.) From this, Ms. Velner opines that the nursing staff's failure to "advocate" for Medina caused him pain and suffering. (Id. Ex. A pp. 4-8.)

In both of her affidavits, Ms. Velner fails to adequately describe what the standard of care should have been or to link that standard to DeBuhr. Ms. Velner implies that DeBuhr could have done more by quoting and relying on the ethical guidelines promulgated from the American Nurses Association. In doing so, she concedes that it is a doctor's duty to diagnose a patient, but she states that it is a nurse's duty, as an advocate, to question a doctor. Ms. Velner acknowledges that DeBuhr was "suspicious of a ruptured [A]chilles tendon" and that DeBuhr referred Medina to a doctor. Nonetheless, Ms. Velner contends that DeBuhr violated the standard of care based on the ethical nursing standards. These vague ethical standards, however, do not delineate the affirmative actions DeBuhr should have taken in this situation. Without more, the standard of care as described by Ms. Velner is insufficient to comply with § 145.682. See Anderson, 608 N.W.2d at 848. In addition, Ms. Velner also fails to describe how DeBuhr's actions caused Medina harm. Instead, she opines generally that the "facility" was negligent to Medina. Section 145.682 requires more than broad or conclusory statements regarding causation. See Stroud, 556 N.W.2d at 556.

With respect to EMSA, Ms. Velner does not adequately describe what the standard of care should have been or to link that standard to EMSA. By quoting and relying on the ethical guidelines promulgated from the American Nurses Association, she concedes that it is a doctor's duty to order medication and aids but states that it is a nurse's duty to question a doctor if medication and aids are not ordered. Again, these vague ethical standards do not delineate the affirmative actions EMSA needed to take in this situation and thus, are insufficient to comply with § 145.682. See Anderson, 608 N.W.2d at 848. Moreover, Ms. Velner fails to describe how EMSA's actions or inactions caused Medina harm. She states that Medina was not given proper ambulatory aids or medication on a regular basis and that his wound was not checked on a daily basis. Although she does not say so, a nurse would likely perform such duties. These specific statements, however, also do not meet the requirements of § 145.682 because they do not describe how EMSA's failure to perform these tasks caused Medina harm. See Sorenson, 457 N.W.2d at 190. Because Ms. Velner's affidavits fail to describe the applicable standard of care or the causation as applied to both DeBuhr and EMSA, they do not meet the requirements of § 145.682.

**B. Affidavit of Dr. Larry McLain**

In his affidavit, Dr. McLain states that the standard for care in this case would be (a) proper clinical diagnosis initially, (b) confirmation with an MRI, (c) immediate consultation with an orthopedic surgeon, and (d) immediate surgery if clinically

indicated. (Sieber Aff. Ex. B ¶ 18.) He reviews the relevant factual background, noting that DeBuhr "made an assessment of a possible ruptured tendon, and referred [Medina] to a doctor." (Id. Ex. B ¶ 5.) He also notes that Medina had an "open, draining, smelly, infected wound." (Id. Ex. B ¶ 11.) Dr. McLain opines that the delays in diagnosing Medina, obtaining an MRI, obtaining orthopedic consultation, and surgery fell below that standard of care. (Id. Ex. B ¶ 17.) He states that "it is my conclusion that [Dr. Platz], as well as EMSA Correctional Care, Inc., and the Corrections Corporation of America, were negligent in their care and treatment of Mr. Medina." (Id. ¶ 19 (emphasis added).)

Although Dr. McLain states what the applicable standard of care is, he fails to state how this standard should apply to DeBuhr. Without a doctor's order, a nurse cannot schedule an MRI or order an orthopedic consultation. Thus, the standard of care, as stated, does not apply to DeBuhr. Dr. McLain's only statement about DeBuhr is that she made "an assessment of a possible ruptured tendon and referred the patient to a doctor." He does not explain how this action by DeBuhr caused harm to Medina. Without more, Dr. McLain's affidavit contains only broad conclusions, and it falls short of detailing "the chain of causation" between any purported violation by DeBuhr and Medina's injuries. See Sorenson, 457 N.W.2d at 190.

With respect to EMSA, again Dr. McLain fails to state to how the standard of care should apply to EMSA, an employer of nurses, because it lists duties that cannot be performed by nurses. In addition, Dr. McLain opines that Dr. Platz, as well as EMSA

Correctional Care, Inc. and the Corrections Corporation of America, were negligent in their failure to treat Medina. He does not, however, discuss causation specifically–i.e., he fails to describe how EMSA's actions or inactions caused injury to Medina. Arguably, the discussion regarding Medina's infected wound falls within the gambit of the nurses' duties to inspect and report infections of the wound. Dr. McLain does not explain how the wound and its infection caused Medina harm. Instead, he states that the delay in diagnosing the injury and the delay in surgery fell below the standard of care. Diagnosing an injury and performing surgery are not functions performed by nurses, and therefore, his allegations of causation do not apply to EMSA. Without more, Dr. McLain's affidavit fails to identify how DeBuhr's or EMSA's actions harmed Medina. See id. Accordingly, Dr. McLain's affidavit fails to meet the requirements of § 145.682.

Because neither Ms. Velner's nor Dr. McLain's affidavits meet the requirements of the statute, Count II will be dismissed pursuant to Minn. Stat. § 145.682, subd. 6.

## II. Negligence

Without specifically stating on which counts they seek summary judgment, EMSA and DeBuhr moved for summary judgment on the "medical malpractice" claims on the grounds that Medina failed to comply with § 145.682. That section, as discussed above, applies to "causes of action as to which expert testimony is necessary to establish a prima facie case." Minn. Stat. § 145.683, subds. 2, 6. In Count I, entitled Negligence, Medina alleges that the defendants "had a duty to provide timely and proper medical care" and

that "because of the late diagnosis, the [A]chilles tendon was not able to heal properly." (See Am. Compl. Count I.) The allegations in Count I, like the allegations in Count II, require the use of expert testimony to establish a prima facie case for a negligence claim of failing to diagnosis Medina's ruptured Achilles tendon. See Bellecourt, 784 F. Supp. at 638-39. Accordingly, the requirements of § 145.682 apply to the allegations in Count I. As with Count II, Count I will be dismissed because Medina has failed to meet the requirements of § 145.682.

Even if the requirements of § 145.682 did not apply to Count I, dismissal is appropriate. The Minnesota Court of Appeals has explained that a plaintiff cannot sustain a common law negligence claim that is merely a restatement of a medical malpractice claim. See Henkemeyer v. Boxall, 465 N.W.2d 437, 440 (Minn. Ct. App. 1991) (citing Sexton v. Petz, 428 N.W.2d 715, 717 (Mich. Ct. App. 1988)). In Count I, Medina alleges that the defendants breached their professional duty to him by failing to diagnosis his ruptured Achilles tendon; this is essentially a restatement of his claim in Count II. Therefore, the claim for common law negligence is unsustainable, and summary judgment on Count I is appropriate. Id.

## III. Constitutionality of § 145.682

Medina argues that § 145.682 is unconstitutional. He contends that the statutory method proscribed for screening meritorious medical malpractice claims is arbitrary and irrational because it deprives litigants of their due process rights. The Minnesota

Supreme Court, Minnesota Court of Appeals, and this Court have previously determined that the application of § 145.682 to medical malpractice claims is constitutional. See e.g., Anderson, 608 N.W.2d at 850, Henke v. Dunham, 450 N.W.2d 595, 598 (Minn. Ct. App. 1990), Gall v. Mayo Clinic, 2001 WL 267490 at * 4 (Minn. Ct. App. 2001), Chizmadia v. Smiley's Point Clinic, 768 F. Supp. 266, 271 (D. Minn. 1991) (Murphy, J.). Specifically in Gall, the statute was challenged on the same basis which Medina brings here. From a review of the materials submitted, the Court determines that Medina's constitutional challenge fails.

## Conclusion

Upon all the files, records, and proceedings herein, and for the reasons stated above, **IT IS ORDERED** that

1. EMSA Correctional Care, Inc. and Kathy DeBuhr's Motion for Partial Summary Judgment (Doc. No. 23) is **GRANTED**;

2. Counts I and II in the Amended Complaint (Doc. No. 12) against EMSA Correctional Care, Inc. and Kathy DeBuhr are **DISMISSED WITH PREJUDICE**; and

3. Plaintiff Charles Medina is hereby ordered, pursuant to Federal Rule of Civil Procedure 4(m), to show cause within ten (10) days from the date of this Order why the claims against defendants A. Platz, M.D., White Cell

Medical, and Mr. Nelson should not be dismissed for failure to make service upon them within 120 days of the filing of the Amended Complaint.

Dated: July 10, 2002

Richard H. Kyle
United States District Judge